# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| NATHALIE McCAMMON-CHASE, M.D., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 09 C 7450 |
| | ) |
| | ) Magistrate Judge Geraldine Soat Brown |
| CIRCLE FAMILY CARE, INC., and DR. | ) |
| BRUCE PEOPLES, M.D. in his individual | ) |
| capacity, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Nathalie McCammon-Chase, M.D. ("McCammon-Chase") filed a complaint against defendants Circle Family Care, Inc. ("CFC") and Dr. Bruce Peoples, M.D. ("Peoples") alleging sex discrimination, interference with rights under the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. ("FMLA"), and pendent state law claims for breach of contract, violation of the Illinois Wage Payment and Collection Act, conversion, and intentional infliction of emotional distress ("IIED"). (Compl.) [Dkt 5.] Defendants have moved to dismiss three of the counts, namely, the claims for interference with rights under the FMLA (Count I), for conversion (Count V), and for IIED (Count VI) pursuant to Fed. R. Civ. P. 12(b)(6). (Defs.' Mot.) [Dkt 30.] The parties have consented to the jurisdiction of a magistrate judge. [Dkt 21.] For the reasons set out below, defendants' motion is granted.

### A.    McCammon-Chase's employment contract with CFC

McCammon-Chase was employed by CFC as the Director of CFC's Maternal Child Health Program.  (Compl. ¶ 5.)  She was supervised by the CEO of CFC, defendant Bruce Peoples, who made decisions regarding her employment.  (*Id*. ¶¶ 7, 82.)  Upon her hiring, she entered into a written employment contract with CFC which was effective from approximately September 1, 2007 through August 31, 2009.  (*Id*. ¶¶ 11, 12; *id.*, Ex. B.)  The contract contained a 90-day notice period of intent to terminate the contract at an earlier date.  (*Id*. ¶ 12; *id.*, Ex. B.)

Pursuant to the parties' contract, McCammon-Chase was due to earn quarterly bonuses based on the number of deliveries she performed, and the bonuses were to be paid three weeks after the end of each quarter.  (*Id*. ¶¶ 14, 15, 17, 72; *id.*, Ex. B.)  McCammon-Chase earned several quarters worth of delivery bonuses totaling more than $50,000 plus interest, but has not been paid any of those bonuses since December 2008.  (*Id*. ¶¶ 16-20.)

Also pursuant to the contract, CFC was required to reimburse McCammon-Chase for certain conference, licensing and compliance fees incurred.  (*Id*. ¶¶ 21, 72; *id*., Ex. B.)  McCammon-Chase incurred such fees during her employment, but was not reimbursed for those expenses.  (*Id*. ¶¶ 22-26.)

Under the contract, CFC was also required to provide additional medical provider support or, in the absence of such support, to pay McCammon-Chase $50 per hour for her performance of

---

[1] The following facts, taken from McCammon-Chase's complaint and attached exhibits, are assumed to be true for purposes of this opinion.  *See Bontkowski v. First Natl. Bank of Cicero*, 998 F.2d 459, 461 (7th Cir. 1993).  Legal conclusions, however, are not accepted as true.  *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S. Ct. 1937, 1949 (2009).

back-up and on-call coverage.  (*Id*. ¶¶ 27, 72; *id*., Ex. B.)  During a three-month period in which her business partner was on maternity leave, McCammon-Chase covered all regular, on-call and back-up shifts.  (*Id*. ¶ 76.)  Under that provision, McCammon-Chase claims she is owed more than $400,000 for the on-call and back-up shifts she worked, but has never been paid for such work.  (*Id*. ¶¶ 30, 31.)  McCammon-Chase has demanded payment on a number of occasions for all of the compensation she believes she is due, but has not been paid.  (*Id*. ¶¶ 73, 74, 80.)

### B.     CFC's denial of McCammon-Chase's requests for sick leave

During McCammon-Chase's employment with CFC, almost all of her sick leave requests were denied.  (*Id*. ¶¶ 34, 36, 37.)  On around July 2, 2009, after being exposed to a patient suffering from the swine flu and then manifesting swine flu symptoms herself, McCammon-Chase advised defendants that pursuant to hospital policy, she would be taking sick time to isolate herself and avoid infecting patients and others.  (*Id*. ¶¶ 39-40, 78.)  Peoples instructed her to return to work or be fired.  (*Id*. ¶¶ 41, 78.)

McCammon-Chase filed a charge with the EEOC on July 27, 2009, and received a right to sue letter on approximately August 31, 2009.  (*Id*.¶ 9; *id*., Ex. A.)

### C.     McCammon-Chase's resignation

In May, 2009, several months prior to the incident described above in which she was denied sick leave, McCammon-Chase tendered her resignation.  (*Id*.¶ 45.)  Her resignation letter stated that she would fulfill the time remaining under her contract with CFC.  (*Id*.)  McCammon-Chase alleges that she tendered her resignation because defendants breached her contract, refused to pay her wages

when due, compromised the physical and emotional safety of the staff, patients, and herself, and refused to provide leave. (*Id.*)

After receiving notice of her resignation, Peoples told McCammon-Chase's staff that they were no longer to report to McCammon-Chase and instead would report to another CFC employee who, McCammon-Chase alleges, was not qualified for the job. (*Id.* ¶¶ 46, 83.) Peoples also instructed CFC staff to cease having any communications with McCammon-Chase regarding her department. (*Id.* ¶ 46.)

McCammon-Chase continued to work past her announced resignation date. (*Id.* ¶ 47.) On approximately September 3, 2009, several days after the expiration of her employment contract, Peoples terminated McCammon-Chase's employment as she was filling out patient charts, and had her escorted out of the building by security. (*Id.*)

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S. Ct. at 1949 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, ___ U.S. ___, 129 S. Ct. at 1950. As the Seventh Circuit has stated:

> A complaint will withstand a motion to dismiss [under Rule 12(b)(6)] if it provides a short and plain statement of the claim showing that the pleader is entitled to relief that is also sufficient to provide the defendant with fair notice of the claim and its basis. In order to demonstrate that he is entitled to relief, however, the pleader must show through his allegations that it is plausible, rather than merely speculative, that

he is entitled to relief.

*INEOS Polymers, Inc. v. BASF Catalysts*, 553 F.3d 491, 497 (7th Cir. 2009) (citations and quotations omitted). Although that standard does not require heightened fact pleading, it does require the complaint to contain enough facts to state a claim for relief that is plausible on its face. *Twombly,* 550 U.S. at 570.

## DISCUSSION

### A.    FMLA interference claim

In Count I, McCammon-Chase claims that defendants interfered with her FMLA rights. The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided [by the FMLA]." 29 U.S.C. § 2615(a)(1). To prevail on a claim for interference with her substantive rights under the FMLA, McCammon-Chase must demonstrate that: "(1) She was eligible for FMLA protection; (2) her employer was covered by the FMLA; (3) she was entitled to FMLA leave; (4) she provided sufficient notice of her intent to take leave; and (5) her employer denied her benefits to which she was entitled." *Smith v. The Hope School*, 560 F.3d 694, 699 (7th Cir. 2009) (citing *Burnett v. LFW, Inc.*, 472 F.3d 471, 477 (7th Cir. 2006)); *De la Rama v. Ill. Dept. of Human Servs.*, 541 F.3d 681, 686-87 (7th Cir. 2008).

Defendants argue that McCammon-Chase's FMLA interference claim must be dismissed because she failed to allege the fourth element of the claim, namely, that she provided sufficient and proper notice to her employer of her desire to take FMLA leave. (Defs.' Mot. at 1-2; Defs.' Reply at 1, 3-4 [dkt 34].) Defendants contend that "[s]imply calling in sick does not provide sufficient notice under the FMLA as it does not imply a serious health condition." (Defs.' Reply at 3.)

McCammon-Chase argues that the facts alleged in her complaint were "sufficient to put Defendants on notice that there was a probable basis that she was entitled to FMLA leave." (Pl.'s Resp. at 1, 3-4.) [Dkt 32.]

The FMLA requires that an employee give notice to her employer that her condition qualifies for FMLA leave. Regarding this requirement:

> [T]he employee's duty is merely to place the employer on notice of a probable basis for FMLA leave. He doesn't have to write a brief demonstrating a legal entitlement. He just has to give the employer enough information to establish probable cause, as it were, to believe that he is entitled to FMLA leave.

*Aubuchon v. Knauf Fiberglass GmbH*, 359 F.3d 950, 953 (7th Cir. 2004); *see also* 29 C.F.R. § 825.301(b). When making the request for leave, "[t]he employee need not mention the FMLA or even be aware of its existence." *Turner v. Adidas Promotional Retail Ops., Inc.*, No. 07 C 2511, 2009 WL 901487 at *6 (N.D. Ill. Mar. 31, 2009) (citing 29 C.F.R. § 825.303(b)). However, "the notice must succeed in alerting the employer to the seriousness of the health condition." *De la Rama*, 541 F.3d at 687 (citation omitted). A "serious health condition" is "an illness, injury, impairment, or physical or mental condition that involves–(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." *Smith*, 560 F.3d at 699 (citing 29 U.S.C. § 2611(11)). "Continuing treatment" by a health care provider includes conditions that require examinations and evaluations over a period of time. *Id.* (citing 29 C.F.R. § 825.115).

McCammon-Chase's complaint does not sufficiently allege that she provided notice of her intent to take FMLA leave. Although McCammon-Chase alleges in her complaint that she was "exposed to" a patient who had the swine flu and that she began to "manifest symptoms of the

illness," she does not allege that she ever *contracted* the swine flu. At the oral argument on the present motion, McCammon-Chase's attorney argued that the swine flu virus was a "global pandemic" which meets the definition of a serious health condition. Even if that were true, if McCammon-Chase never contracted the illness, it is irrelevant whether swine flu meets the definition of a serious health condition. *See Rhoads v. F.D.I.C.*, 257 F.3d 373, 384 (4th Cir. 2001) (holding that plaintiff must "prove that she was afflicted with an FMLA-qualifying condition, because otherwise she did not have any right under the Act with which her employer could have interfered"); *Phillips v. Quebecor World RAI, Inc.*, No. 04-C-330, 2005 WL 6126702 at *8 (E.D. Wis. Aug. 16, 2005) ("The question of whether or not an employer had adequate notice of an employee's need for FMLA leave only arises when the employee indeed had a condition which would qualify him or her for FMLA leave.").[2]

Equally significant, McCammon-Chase also fails to allege that she ever *advised her employer* of a sufficient need to take FMLA leave. Rather, she advised her employer that "she would be taking *sick time*." (Compl. ¶¶ 40, 78 (emphasis added).) According to McCammon-Chase's complaint, the reason she gave for taking time from work was not for treatment but rather "pursuant to hospital policy . . . to isolate herself and avoid infecting patients, staff and any other persons." (Compl. ¶ 40.)

---

[2] Because McCammon-Chase did not plead that she contracted the swine flu, it is not necessary to reach the question of whether the swine flu could meet the definition of a "serious health condition," constituting an "illness" involving "continuing treatment by a health care provider" under 29 U.S.C. § 2611(11) and 29 C.F.R. § 825.115. *But see* 29 C.F.R. § 825.113(c) (stating that "[o]rdinarily, unless complications arise, the common cold, *the flu*, ear aches, upset stomach, minor ulcers, headaches other than migraine, . . . etc., are examples of conditions that *do not meet* the definition of a serious health condition" (emphasis added)); *Jones v. Denver Pub. Schs.*, 427 F.3d 1315, 1322, 1323 (10th Cir. 2005) (citing regulation to support conclusion that plaintiff did not have serious health condition); *Plesha v. U.S. Steel Corp.*, No. 2:05-CV-201, 2007 WL 465447 at *9 (N.D. Ind. Feb. 7, 2007) (same).

That is insufficient under the *de la Rama* decision, in which the court concluded that the plaintiff's advising her employer only that she "was sick" did not "succeed in alerting the employer to the seriousness of the health condition." 541 F.3d at 687. *See also Collins v. NTN-Bower Corp.*, 272 F.3d 1006, 1008 (7th Cir. 2001) (holding that, even assuming employee had serious health condition, advising employer only that she was "sick" was inadequate because "'[s]ick' does not imply 'a serious health condition'"); 29 C.F.R. § 825.303(b) (stating that "[c]alling in 'sick' without providing more information will not be considered sufficient notice to trigger an employer's obligations under the Act"). Where an employer is not advised of the need for FMLA leave, the employee has not met her obligation to provide notice to the employer as required under the Act. *Collins*, 272 F.3d at 1008; *Price v. City of Fort Wayne*, 117 F.3d 1022, 1026 (7th Cir. 1997) (stating that the FMLA "requires that the employee give notice of *need* for FMLA leave. This kind of notice is given when the employee requests leave for a covered reason.").

The result might be different if McCammon-Chase had pled that she actually had the swine flu, *and* that she advised her employer of that fact. But here McCammon-Chase does not allege that she actually had the swine flu, and she does not allege that she advised her employer that she had swine flu. She alleged merely that she "called in sick to work" after being "exposed to" the swine flu and experiencing flu symptoms. (Compl. ¶ 78.) A claim for FMLA interference cannot stand on those allegations. Without a serious health condition, McCammon-Chase is not entitled to FMLA leave; and, if she is not entitled to FMLA leave, there can be no interference with her FMLA rights. Accordingly, defendants' motion to dismiss the FMLA interference claim is granted.

**B.      Conversion claim**

In Count V, McCammon-Chase seeks recovery under the tort of conversion.  To state a claim for conversion, a plaintiff must allege: (1) the unauthorized and wrongful assumption of control, dominion, or ownership by a person over the property of another; (2) the plaintiff's right in the property; (3) the plaintiff's right to immediate possession of the property; and (4) a demand by the plaintiff for possession of the property.  *Eggert v. Weisz*, 839 F.2d 1261, 1264 (7th Cir. 1988); *Bill Marek's The Competitive Edge, Inc. v. Mickelson Group, Inc.*, 806 N.E.2d 280, 285 (Ill. App. 2d Dist. 2004).  "The essence of conversion is the wrongful deprivation of one who has a right to the immediate possession of the object unlawfully held."  *In re Thebus*, 483 N.E.2d 1258, 1260 (Ill. 1985) (quoting *Bender v. Consolidated Mink Ranch, Inc.*, 441 N.E.2d 1315, 1320 (Ill. App. 2d Dist. 1982)).

McCammon-Chase alleges that the defendants converted wages, bonuses and other compensation that the defendants owe her under the contract.  (Compl. ¶¶ 71-74.)  Money can be the subject of a conversion claim in only limited circumstances.  *Sutherland v. O'Malley*, 882 F.2d 1196, 1200 (7th Cir. 1989).  As the Illinois Supreme Court explained:

> [T]he subject of conversion is required to be an identifiable object of property of which the plaintiff was wrongfully deprived.  Money may be the subject of conversion, but it must be capable of being described as a specific chattel, although it is not necessary for purposes of identification that money should be specifically earmarked.  However, an action for the conversion of funds may not be maintained to satisfy a mere obligation to pay money.

*In re Thebus*, 483 N.E.2d at 1260.  Money may be characterized as specific chattel if it is "a specific fund or specific money in coin or bills."  *Sutherland,* 882 F.2d at 1200 (citations omitted).  It must also be a determinate amount, not merely a right to an indeterminate sum.  *Id.*  Money is sufficiently

9

identifiable where a specific amount is transferred to a bank from an outside source. *Gates v. Towery*, 435 F. Supp. 2d 794, 801 (N.D. Ill. 2006). Furthermore, the money at issue must have "at all times belonged to the plaintiff." *In re Thebus*, 483 N.E.2d at 1261; *accord Horbach v. Kaczmarek*, 288 F.3d 969, 978 (7th Cir. 2002).

Defendants argue that McCammon-Chase's claim for conversion "merely alleges breaches of a contractual obligation," which does not support a claim of conversion. (Defs.' Mot. at 3; Defs.' Reply at 6.) Defendants further argue that the money at issue did not at all times belong to McCammon-Chase, as is required to state a claim. (Defs.' Reply at 5-7.) Relying on the *Bill Marek's* case, McCammon-Chase argues that she has alleged all of the elements necessary to state a claim for conversion, including a "sufficiently identifiable" amount that was transferred from an outside source. (Pl.'s Resp. at 5-6.)

McCammon-Chase's claim does not fall within the limited circumstances under which money can be the subject of a claim for conversion. A review of the facts in *Bill Marek's* demonstrates why it does not support McCammon-Chase's claim. In that case, Union Underwear Company, Inc., which was not a party to the appeal, owed the plaintiff unpaid sales commissions but mistakenly paid the commissions to the defendant, which had replaced the plaintiff as Union's sales representative. 806 N.E.2d at 282. Union then filed for bankruptcy. *Id.* at 283. The plaintiff had no relationship to the defendant that would support a contract claim, and sued the defendant for conversion and the imposition of a constructive trust over the commissions, obtaining a judgment against the defendant for the commissions. On appeal, the defendant argued that the plaintiff should not have been entitled to assert a conversion claim for a "mere failure to pay money" not capable of being described as specific chattel. *Id.* at 285. The appellate court affirmed the judgment. *Id.* at

10

292. The court observed that although there can be "no conversion action for money represented by a general debt or obligation," the relationship between the defendant and the plaintiff was not debtor-creditor:

> [U]nlike the amount allegedly converted in *Thebus*, the amount defendant converted in this case [*Bill Marek's*] was not a portion of its own assets that defendant was obligated to use to satisfy a debt to plaintiff. Rather the funds were the specific funds transferred to defendant from an outside source, Union.

*Id.* at 286-87.

In this case, McCammon-Chase's claim for money is based on her contract with defendant CFC. The relationship she alleges is debtor-creditor. The amounts she claims, including not only bonuses due for certain types of deliveries, reimbursement for annual membership fees in professional organizations, and expenses for professional conferences, are (if liability is established) general obligations or debts of CFC, not specific funds transferred to CFC for McCammon-Chase. Because there is privity between McCammon-Chase and CFC, in contrast to the situation in *Bill Marek's*, McCammon-Chase is able to bring a breach of contract action against the defendants to recover the money allegedly owed. Indeed, at oral argument, McCammon-Chase's counsel conceded that there was no additional remedy that the conversion claim could provide which the breach of contract claim could not.

McCammon-Chase's conversion claim is also defective in a number of other ways. McCammon-Chase has not alleged a "determinate amount" of money that is "identifiably distinct." The complaint fails to specify the amounts allegedly owed to her for conference fees (*see* Compl. ¶¶ 25, 26), unpaid back-up and on-call coverage wages (*see* Compl. ¶¶ 27-31), or unpaid delivery bonuses (*see* Compl. ¶¶ 18, 31), alleging only that such unpaid coverage wages are "upwards of

$400,000" and such unpaid bonuses are "upwards of $50,000." Furthermore, even if, *arguendo*, the money could be considered a specific chattel, as McCammon-Chase argues, it did not "at all times belong[]" to her, as required to state a conversion claim. McCammon-Chase's employment contract states that CFC will:

> [p]ay quarterly bonuses to Physician as mutually agreed upon from funds generated from deliveries. *After satisfactory reconciliation* the bonuses will be paid within three weeks from the close of the quarter.

(Compl., Ex. B at 1 ¶ 3 (emphasis added).) Pursuant to that language, McCammon-Chase is not entitled to the bonuses at issue until a condition is met, namely, a "satisfactory reconciliation." Regardless of how simple or onerous that condition may be, the bonuses cannot have "at all times belonged to" McCammon-Chase if there is a condition that had to be met before she is entitled to those monies. In *Doing Steel, Inc. v. Castle Constr. Corp.*, No. 02 C 1674, 2003 WL 21254345 at *3, 4 (N.D. Ill. May 29, 2003), a motion to amend the complaint to add a conversion claim was denied on the basis of futility for that reason. There, the subcontract between the parties required the defendant to pay the plaintiff upon the "satisfactory performance" of its work. *Id.* at *3. The court found that the money did not at all times belong to the plaintiff because the terms of the contract placed conditions on the plaintiff's receipt of those payments, *i.e.*, it was entitled to the money only upon the successful performance of its duties. *Id.*; *see also Horbach*, 288 F.3d at 977-78 (affirming dismissal of conversion claim where plaintiff could not show that the money at all times belonged unconditionally to him).

In summary, McCammon-Chase's conversion claim is nothing more than a breach of contract claim, or a claim "for money represented by a general debt or obligation." It is not a claim for conversion. *See In re Thebus*, 483 N.E.2d at 1261; *General Motors Corp. v. Douglass*, 565 N.E.2d

93, 98 (Ill. App. 1st Dist. 1990); *Doing Steel*, 2003 WL 21254345 at *2. Thus, defendants' motion to dismiss the claim for conversion is granted.

### C.    IIED claim

Finally, in Count VI, McCammon-Chase attempts to allege the tort of intentional infliction of emotional distress (IIED). To state a cause of action for IIED, a plaintiff must allege facts which establish that: (1) the defendant's conduct was extreme and outrageous; (2) the defendant either intended that his conduct should inflict severe emotional distress, or knew that there was a high probability that his conduct would cause severe emotional distress; and (3) the defendant's conduct in fact caused severe emotional distress. *Doe v. Calumet City*, 641 N.E.2d 498, 506 (Ill. 1994), *overruled in part on other grounds by In re Chicago Flood Litig.*, 680 N.E.2d 265, 273 (Ill. 1997); *Cook v. Winfrey*, 141 F.3d 322, 330 (7th Cir. 1998). Defendants argue that McCammon-Chase has not alleged the first element, namely, extreme and outrageous conduct on behalf of defendants. (Defs.' Mot. at 4-5; Defs.' Reply at 7-10.)

"Whether conduct is extreme and outrageous is judged on an objective standard based on all the facts and circumstances of a particular case." *Calumet City*, 641 N.E.2d at 507. Liability does not extend to "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Id.* (quoting Restatement (Second) of Torts § 46, Comment d at 73 (1965)). The tort only applies when the conduct is "so outrageous in nature and so extreme in degree that it goes beyond all possible bounds of human decency and is intolerable in a civilized society." *Piech v. Arthur Andersen & Co., S.C.*, 841 F. Supp. 825, 841 (N.D. Ill. 1994) (citations omitted). The extreme and outrageous character of the conduct can arise, for example, from the abuse of a position of power,

or from the defendant's awareness that the plaintiff is particularly susceptible to emotional distress because of a physical or mental condition or peculiarity. *Calumet City*, 641 N.E.2d at 507. In the employment setting, though, the conduct alleged must be particularly outrageous. *Piech*, 841 F. Supp. at 831 (collecting cases). "[P]ersonality conflicts and job transfers are unavoidable aspects of the modern work place and may cause stress on the employee"; however, allegations of job-related stress do not state a claim for IIED, otherwise "nearly all employees would have a cause of action." *Id.*

McCammon-Chase focuses on the following incidents alleged in her complaint in arguing that she has pled extreme and outrageous conduct: (1) Peoples' order that McCammon-Chase "return to work or be fired" after she was exposed to a patient with the swine flu (Compl. ¶ 78); (2) Peoples' blocking her from departmental e-mail communications and directing staff to cease all communications with her and report to an employee who McCammon-Chase did not believe was qualified for the position (*id*. ¶¶ 46, 82-83); and (3) Peoples' termination of McCammon-Chase's employment by way of having her escorted out of the building by security while she was updating patient charts (*id*. ¶ 47). (Pl.'s Resp. at 7-8.) McCammon-Chase argues that this conduct put her medical license at risk and exposed her to professional, legal and potential criminal liability. (Compl. ¶ 84; Pl.'s Resp. at 7-8.)

These allegations, as articulated in the complaint, fail to rise to the level of extreme and outrageous conduct necessary to state a claim for IIED. Ordering an employee who never actually had the swine flu to return to work is hardly extreme and outrageous conduct. As discussed above, the reason McCammon-Chase gave defendants for not coming to work (as alleged in the complaint) was "hospital policy . . . to isolate herself and avoid infecting patients, staff and any other persons."

(Compl. ¶ 40.)  That defendants failed to apply what McCammon-Chase viewed as hospital policy in that situation is not extreme and outrageous conduct.  Similarly, Peoples' instruction to staff that they report to a new supervisor and cease communicating with McCammon-Chase regarding the Department *after* McCammon-Chase gave her notice of resignation cannot be considered extreme and outrageous.  And, finally, being escorted out of the building cannot be considered extreme and outrageous behavior; indeed, it is hardly uncommon for terminated employees to be escorted out of their workplaces, and, in this case, McCammon-Chase was escorted out *after* her contract had expired and *after* the effective date of her own resignation.[3]

McCammon-Chase's other allegations are likewise insufficient to show extreme and outrageous conduct.  She alleges that she had to work "irregular and excessive" hours (Compl. ¶¶ 35, 76, 77, 79), but that work was contemplated by the employment contract she signed and, in fact, she contracted to receive extra compensation for such hours.  (*See* Compl. Ex. B ¶ 12.)  Similarly, she alleges that Peoples made disparaging remarks about her, but provides no details regarding those remarks other than to state generally that they were "disparaging."  (Compl. ¶ 82.)  Such a vague allegation does not qualify as outrageous behavior.  McCammon-Chase also alleges that Peoples "shunned her" and refused to speak to her for months at a time (*id.*); but the complaint alleges no time frame with respect to that conduct, and McCammon-Chase had resigned from her position months before her termination.  Nor is McCammon-Chase's allegation that she suffered extreme financial hardship due to her loss of compensation (*id*. ¶¶ 79-81) sufficient.  The dispute over how

_____

[3]  The fact that McCammon-Chase was reviewing patient files at the time she was escorted out of the building hardly makes Peoples' actions appear less reasonable; the complaint does not allege what right McCammon-Chase had to be on the grounds and accessing patient files after her contract ended.

much money she may be owed pursuant to her contract with CFC is not atypical of many workplace disputes, and simply cannot be considered "so outrageous in nature and so extreme in degree that it goes beyond all possible bounds of human decency . . . ." *Piech*, 841 F. Supp. at 831.[4]

Courts in this district have dismissed IIED claims on facts similar to, or arguably more egregious than, those alleged here, holding that the acts alleged did not rise to the level of extreme and outrageous conduct necessary to state a claim of IIED. *See, e.g.*, *McKay v. Town & Country Cadillac, Inc.*, 991 F. Supp. 966, 972 (N.D. Ill. 1997) (dismissing IIED claim alleging that the owner of the company verbally abused and insulted plaintiff-employee, repeated false statements about him to others, took away his demonstration vehicle, reduced his compensation, searched his phone records, docked him for various personal leave days, ordered him to reimburse the company for draws previously made against his commission, and then terminated his employment); *James v. Heartland Health Servs.*, No. 04 C 2744, 2005 WL 678732 at *6 (N.D. Ill. Jan. 28, 2005), (dismissing employee's IIED claim and holding that her allegations amounted to "little more than annoyances and insults," where the employee claimed she was suspended for three days without pay, removed from her workplace site, forced to work over the holidays when younger employees were not, questioned regarding a doctor's note, harassed by managers, and terminated).[5]

---

[4] Moreover, with few exceptions, Illinois law does not compensate mental distress caused by a breach of contract. *See Patton v. Univ. of Chi. Hosp.*, 706 F. Supp. 627, 632 (N.D. Ill. 1989) (stating that "Illinois law does not permit compensation for mental distress resulting from a breach of contract, 'except where the breach was wanton or reckless and caused bodily harm, or where the defendant had reason to know, when the contract was made, that its breach would cause mental suffering for reasons other than mere pecuniary loss'" (citation omitted)).

[5] *See also Harriston v. Chi. Tribune Co.*, 992 F.2d 697, 703 (7th Cir. 1993) (affirming dismissal of IIED claim for failure to show extreme and outrageous conduct where employee alleged among other things she was forced out of her management position, excluded from office activities, not advised of changes in policy, falsely accused of having poor sales, reprimanded for no reason,

Although McCammon-Chase alleges that she has several physical conditions (asthma, diabetes, and hypertension) which may have made her more susceptible to emotional distress, that allegation is not enough to save her claim. A peculiar susceptibility to distress of which the defendant is aware is a factor in determining whether a defendant's conduct was extreme and outrageous, but "major outrage is still essential to the tort." *Rudis v. Natl. College of Ed.*, 548 N.E.2d 474, 478 (Ill. App. 1st Dist. 1989) (citing *Public Fin. Corp. v. Davis*, 360 N.E.2d 765 (Ill. 1976)). McCammon-Chase's allegations, even coupled with her alleged susceptibility to distress, fall short of the level of extreme and outrageous conduct needed to state a claim for IIED.

Finally, although not raised in the parties' briefs, McCammon-Chase's claim is also vulnerable because she has not alleged the second element: that defendants intended their conduct to inflict severe emotional distress. Not only does McCammon-Chase fail to plead intent but the facts pled do not lend themselves to an inference that defendants intended to inflict severe emotional distress. For example, there are no facts suggesting that defendants' failure to hire a back-up provider (which would have alleviated the "irregular and excessive hours") was done with the intent to cause severe distress. Nor do the facts suggest that McCammon-Chase's being escorted out of

---

ignored regarding her concerns for her property and safety, and had her major account taken away and her phone calls monitored); *Piech*, 841 F. Supp. at 831-32 (dismissing IIED claim for failure to plead extreme and outrageous conduct where employee's allegations included that she was repeatedly discriminated against for taking disability leave, harassed and continuously exposed to offensive humor of a sexual nature, given demeaning work assignments, and unfairly denied promotions); *Chisholm v. Foothill Capital Corp.*, 940 F. Supp. 1273, 1286 (N.D. Ill. 1996) (dismissing IIED claim for failure to plead extreme and outrageous conduct where employee claimed she was denied business and advance opportunities, subjected to derogatory comments, and retaliated against for complaining about discrimination); *Fernando v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 882 F. Supp. 119, 122, 123 (N.D. Ill. 1995) (dismissing IIED claim for failure to plead extreme and outrageous conduct where employee was subject to extreme verbal abuse, including racial slurs and derogatory comments, and was effectively denied the opportunity to continue his residency).

the building was intended to inflict severe emotional distress.  Similarly, the facts do not suggest that McCammon-Chase's being cut off from various work-related communications was done with the intent to inflict distress; indeed, McCammon-Chase had already tendered her resignation.  (Compl. ¶¶ 46, 83.)  The facts, as pled, do not show the requisite intent.  *See Iqbal*, ___ U.S. ___, 129 S. Ct. at 1950 (stating that "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not 'show[n]'-'that the pleader is entitled to relief'" (citing Fed. R. Civ. P. 8(a)(2))).  *See also INEOS Polymers*, 553 F.3d at 497 (stating that "the pleader must show through his allegations that it is plausible, rather than merely speculative, that he is entitled to relief"(citation and quotation omitted)).

Accordingly, defendants' motion to dismiss the IIED claim is granted.

## CONCLUSION

For the reasons set forth above, defendants' motion to dismiss Counts I, V, and VI for failure to state a claim is granted.  Those counts are dismissed.

**IT IS SO ORDERED.**

_____
GERALDINE SOAT BROWN
United States Magistrate Judge

DATED: July 23, 2010